Your honors, may it please the court, we assert that the underlying court made three errors, reversible errors at the lower court level. The first one is their definition for pivotally attached. We believe the definition that the court adopted was too restrictive, that it referred to pivots involving pins, and that such a... Pivotably attached has to mean some kind of pivoting, right? Yes. Some kind of movement, it's not just attached in unmovable fashion. Correct, your honor. Well, that may be the issue, your honor, right there that I think the judge at the lower court got caught up on. He seemed to be caught up on the Pearson reference. The Pearson reference has a fixed connection between the vertical rod and the guide sleeve down below. It's welded fixed. And when the patent was obtained, it overcame the Pearson reference. And it did so with a pivotal attachment. And so the judge seemed to adopt this theory that if it's fixed between the rod and the guide sleeve, that therefore there can be no pivotal attachment. Where is the pivotal attachment then in the accused's device? There is a vertical guide sleeve, excuse me, a horizontal guide sleeve at the top center of the device. And that horizontal guide sleeve runs on a rod and has two very long extending arms that basically float in space. And as a result of those long moment arms, as a weight lifter with heavy weights lifts the bars, or lifts the weight lifting bar on those vertical rods, there is all sorts of movements that result from that. The arms move. Yes, your honor. Well, that sounds like torsion rather than pivoting. Your honor, actually, there may be some torsion going on, and our expert believes that there was. But there's actually pivoting going on at that top center unit. That, in fact, in the... But you're talking now about a special attachment here, one that is pivotably attached. This is hard. I mean, when they're fixed together in a way that doesn't permit movement other than through forces, super forces of nature, is that pivotably attached? It can be, your honor. It can be? Yes, I think there's... Tell me out here. Sure. I think there's a misconception that we're looking at the bottom and we're saying down at the bottom where those horizontal guides run at the bottom, that because that in the accused device, because that is welded or otherwise fixed, that therefore it's not pivotally attached. But the claim doesn't really say that. The claim says pivotally attached at the top or the bottom, and this pivotal attachment is occurring at the top. But isn't it welded at the top as well as at the bottom? It is, but because these arms are allowed to free float in space off of that center top sleeve, you can get all kinds of pivoting motion without torsional deflection. When you say pivoting motion, it says attached. Yes, and it is. The attachment, your honors, is the vertical rods attached to the horizontal. But I believe the court is reading into that, that the attachment, because it's welded, the overall attachment, you're looking at a spot attachment. It's attached, but I don't see any pivoting mechanism there at all. We've got to have some pivoting mechanism, don't we? The way it's constructed. They're not attached as firmly as you can attach something. They are, your honor, but the way they are assembled creates that pivotal attachment. The way the vertical and the horizontal arms are assembled together creates that pivotal attachment. It is apparent in Exhibit J, filed with the court, the video. In that video, I realize Hoist has made an issue of the clamped part of that video where the center guide sleeve is clamped. Setting that aside, forgetting that part of the video, there is pivoting going on that's very apparent at the bottom of those vertical rods. As the person lifts the bar, you can see the pivoting action. It's not a steel bar bending. That's not what we're talking about. As the person lifts, you can see 2, 3, 4 inches of pivoting going on. It's because of the way it's constructed. It is deceiving, I will admit, but I believe that that's an issue for the trier of fact. Just because there's no pin, a toggle pin, as shown in Figure 2 of the patent in this case, that shouldn't be the only type of pivotal attachment we're discussing here. I think there's a pivotal attachment elsewhere, and that's in the overall construction of the vertical and the horizontal members. An example we mentioned, which I think is worth repeating now that we're in basketball season, is the basketball pivot leg of a basketball player. There's no pin. There's no turning on a pin. This is a basketball player's legs. One leg stays fixed. The other leg pivots. That's a common accepted term of pivoting. That is, one leg is pivotally attached to the other leg. It's the way the human body is assembled. It doesn't pivot when he bends his knee. Correct. It does not. I think, Your Honor, that you're reading too much into torsional deflection. There is a pivot going on. Nowhere in Exhibit J do you see steel rods magically bending. They're not bending. Steel rods aren't bending. What's going on is there's pivoting motion around that center pin at the top. That's what's going on. We're not showing any metal bending. The metal rods stay straight throughout that video, and that's what we believe a jury should have the right to see and make that determination for themselves. The second error that the court made was that the device most definitely pivots, and we again refer the court to Exhibit J. There's something about Exhibit J I'd like the court to see. In Exhibit J, we were very fair to hoist. We did not put weights on the bar. There's no weights on that bar. When you add hundreds of pounds of weights to that bar, you get even more movement than you would with no weight on that bar as the weightlifter gets fatigued and goes through the weightlifting motion. We believe that when the facts are construed in a light most favorable to MAXRAC, because this was decided on summary judgment, when the facts are construed in a light most favorable to MAXRAC, we believe that there's pivoting shown through that interconnection of all the parts. The third and final error that we believe that the court made was the safety catch mechanism properly defined by the court in the 859 patent. And the one thing I'd like to say here in oral argument that maybe didn't get as much attention in the briefs, it was certainly discussed, but needs the most attention in my view, is page 1436 of the joint exhibit. And in that, there's an examiner's office action. And in that examiner's office action, he says, and I quote, there is no suggestion in the prior art of record of a safety catch between the guide sleeve assemblies of a vertically and horizontally guided bar and the stationary frame. Hoist makes quite a reference to this gun rack situation, the pins that come down the rack, saying that that was in the prior art. Agreed, it was. We have no debate there. But the examiner didn't allow the patent because of the gun rack pieces. The examiner allowed the patent because he said there was no suggestion in the prior art of record of a safety catch between the guide sleeves and the vertically and horizontally guided bars, whereas hoist safety catch, hoist safety catch, is right there at those guide sleeves. It's shown in the pictures in the briefing. What about the pair of language? The nice thing about your claimed invention is I can go back or forward and stick it on the safety because there's a pair of mechanisms. Where's the pair in the Q's device? In the section of the bar, there's three sections of their bar. It's not one bar as shown in the exploded view. They have the part out on each end where the weights are applied. Sure. Then they have the part in the middle where the lifter is holding it. Yes. And then they have an intermediate part that has collars around it. Is there a pair on each of those columns? One on the left, one on the right forming the pair. No, no, no. It's a pair of mechanisms at the same time so you can go back or forward as shown by the patent here, right? Theirs can go backwards and catch, forwards and catch. Yes. You understand my question that there are two features on your safety catch mechanism which comprise a pair, one to catch it going backwards, one going forwards. They have only a slightly raised portion on their bar which is not a paired mechanism at all. It's a single raised portion on the bar which you say doesn't need to be there at all. The safety catch is going to, the gun rack is going to catch it regardless of where you stick the bar in. Your Honor, I refer you to Claim 16 which is the claim in the 859 patent that is in dispute here. And next to the last element says a pair of safety catch mechanisms in association with the weight-bearing bar. The pair of safety catch mechanisms, so one here and the other one here, that's in association with the weight-bearing bar. And there is no purpose other than that. You can't put weight in that zone. You can't put your hands in that zone. You can only, the only purpose it's there for is to catch. And the examiner clearly brought that out when he said the reason this was unique was because you're putting that catch in association with the vertical guide sleeves. I'll reserve the balance of my time for rebuttal. Thank you, Mr. Stanley. Ms. Meyer. May it please the Court. Susan Meyer for Hoist Fitness. I'll address the 510 patent first, and we believe that the Court was correct in its claim construction. The word pivotally is a commonly used word and not one requiring any scientific knowledge or other background. The ordinary dictionary meaning is to turn as if on a shaft or pin. This construction is consistent with the usage in the intrinsic evidence. Figure 2 of the patent shows of actually using a pin. The applicant argued to overcome the Pearson reference, as Max Rack mentioned. And they were talking about this possibility of skewed movement, possibility of bearing binding, that kind of thing, which was the reason that this pivot was required. Max Rack's construction, on the other hand, is wrong because it ignores the fact that it is the attachment that is required to be pivotal. It can't be just anywhere. It can't be pivoted someplace on the machine. It's required to be at the point of attachment. The claim is not ambiguous about this. It's a pivotal attachment. The district court did not limit the construction to the preferred embodiment, even though the preferred embodiment does have a pin structure. What the district court said was as if to turn on a pin or a shaft. This leaves room for covered designs that don't actually use the pin or shaft arrangement. The fact that the ordinary meaning is a pin or shaft and the preferred embodiment showed a pin just indicates that the claim was drafted deliberately. Moving on to our argument for non-infringement, there's no pivot or even any torsional deflection, which is their argument about what's going on with those upper stabilizing cross arms, at the point of attachment. The point of attachment, if I can point back, is up here where it is an L bracket. That L bracket is rock solid. In fact, it's a fixed end mounting, which, as we showed in our summary judgment motion, is understood in the industry as being one where not even any deflection can occur in that area because our client, when building it, met the length of engagement equal to or greater than 1.5 times the shaft diameter, deliberately making it a fixed end mounting. In addition, it's got a single bolt right through the top of it, and it's secured with a lock washer and then wrenched tight. So at that point of attachment, which, in fact, in Max Rack's briefing on page 24, I believe, they have a point that says point of attachment, and that point of attachment is here. Now, granted, they call this the attachment mechanism across here, but nowhere in the claim is there an attachment mechanism. The only thing in the claim is a pivotal attachment. Moving on to the 859 patent, the only issue, because Max Rack has agreed with the claim construction, is application of the construed claim to the hoist device. The court's construction, I don't believe, is broad, as Max Rack has asserted, because it not only talks about the fact that these are hooks or stops or latches, but also talks about its relationship with the bar. The place that the hoist device rests, or racks, is the bar itself. If you were to remove this area right here, you wouldn't be able to hang your weights. The fact that it is welded to the vertical guide sleeves only indicates that it works as is intended, that it can move up and down and forward and backward. The fact that a rubber donut is attached to the lateral sides of the vertical guide sleeve is only due to the fact that they don't want Olympic-sized weights sliding in and banging up against the machine. It doesn't change the fact that that lateral side is still the bar. And, in fact, in Max Rack's own patent, on call-out number 32, it says bar, and it points to the lateral portion of the weight-receiving bar. Therefore, they admit that the part on the outside that accepts the weight is the bar itself, too. The hoist device contains no additional mechanisms and no other thing to help rack it, other than the bar itself racking on what has been admitted to be prior-art gun-racking mechanisms. The fact that the outside has a greater diameter than the inside doesn't change the fact that it's still the weight-receiving end of the weight bar. The larger diameter is to accept the Olympic-sized weights, and the inner diameter, or the part that's the user-engaging surface, is a little smaller to make it easier for the user to wrap his or her hands around. But it doesn't automatically change that lateral portion into a safety-catch mechanism. Lastly, Max Rack has alleged that the district court made inferences against Max Rack, and the fact is that the court did what district courts do, which is took a look at the construed claims, applied it to the accused device, and came to the conclusion that no reasonable jury could find infringement. In conclusion, our arguments are simple. The hoist accused device does not have a pivotal attachment and does not have a pair of safety-catch mechanisms. Thank you. Thank you, Ms. Meyer. Mr. Standley, you have three, almost four minutes remaining. First, Your Honors, with respect to the device that's in the courtroom today, we just want to point out that it's not a scale model. The construction is just shortened. As a result of that, you don't see much movement with this device. I encourage you to look at the real device, which is Exhibit J. One other item I want to point out, which is a hoist side of the case in this case, the calicrate case. The calicrate case speaks of a lever pivotally mounted to a ligation tool body such that the lever pivots about a fulcrum pin. This is a CAFC case from 2005, I believe. And the court in this case calicrate said, this language does not require a fulcrum pin, nor does this language require a fulcrum pin substantially perpendicular to the pulling direction of the endless loop. In sum, the claim language and the specification description are both broader than the district court's definition for lever. So this court did not like the district court's definition of pivotally mounted in the calicrate case. We have the words pivotally attached here, and I submit that those two structures, mounted or attached, are basically the same. The last thing I'd like to say to the court is that we believe there is a question of fact in this case that should be allowed to go to the trier of fact as to whether hoist has a safety catch mechanism in association with their bar, and also whether or not their device pivotally attaches to that horizontal guide sleeve at the top of the unit. We thank the court for its time. All rise. The Honorable Court is adjourned until tomorrow morning at 10 a.m. Thank you.